1752, Intl. Longshoremen Association. Mr. Messinger. Good morning, Your Honor, and may it please the Court. Section 14b of the National Labor Relations Act allows states to ban any compulsory union fees that can be charged to employees under Section 883's proviso. And according to the Board's decision in Kingston Constructors, under the proviso, employees can be charged any fee that is periodic, uniformly imposed, and not devoted to a purpose that is inimical to public policy. And according to Beck, this includes fees for contract administration. Here, Local 1752's referral fee, which is a percentage of wages, is periodic, uniformly imposed, and not devoted to a purpose inimical to public policy. In fact, it is a fee for contract administration, for when a union is operating a hiring hall, it's administering a term of the collective bargaining agreement. Therefore, this is a type of fee that can be charged to employees under Section 883's proviso and is thus a fee that Mississippi can ban under Section 14b of the National Labor Relations Act. Now, the union's primary response to this argument is the notion that under the proviso, the proviso allows for unions to charge employees for fees that go for the union's institutional expenses, but not for special purposes, such as for a hiring hall. However, this is — The argument is that you don't even have to get to the proviso to find the fees lawful because they're not discriminatory under the precedent. Speaking of whether there's a duty of fair representation violation in the first instance, Your Honor? You only get to the proviso if there's discrimination, right? Yes, Your Honor. Under Beck's analysis, first, there's a duty of fair representation violation by virtue of the compulsory fee, and then as a defense, the union can raise the argument that it has statutory authority to require payment of that fee under the proviso or the National Labor Relations Act or whatever other source the union wishes to claim. But here there is a presumptive duty of fair representation violation for at least two reasons, the first of which, as noted before, was Beck. That was the analysis in Beck. A compulsory agency fee for including administering the contract presumptively violated the duty of fair representation unless the union could prove authority to charge that fee under the National Labor Relations Act. The union in that case claimed the proviso gave it authority to charge that fee, and the court then construed the proviso to allow for certain charges but not others. One of the charges that the court construed the proviso to allow was fees for contract administration. And because the proviso allows fees for contract administration, that's a type of fee that Mississippi can ban under 14b. And that's the holding, for example, of the Seventh Circuit in Sweeney and also the D.C. Circuit in Plumbers Local 141, which acknowledge that the fees chargeable under Beck, under the proviso construed in it, states can ban under Section 14b. And so it's the symmetry between the act here that I think is important. If it can be charged under the proviso, it can be banned under 14b. And the key to Sims' position is that this is a fee that can be charged under the proviso. If someone's a union member, I know Mr. Sims isn't, if someone belongs to the union, do they pay a referral fee based on the hiring call and then also a separate union fee? Not to my understanding, Your Honor, at least on the face of the complaints, this is on a 12b6 motion, so the record's limited to the complaint. The union's demand letter said you either have to pay union dues or referral fees as a condition of being referred through the hiring call. And so I can't say on this record if the union fee or the union dues are the equivalent to the referral fee charged to Mr. Sims. To the extent, however, that becomes dispositive to this Court's decision, that would be a reason for remanding for further investigation into exactly what the fees were and exactly what were they devoted to. I must be missing something here, which wouldn't be new. This has been the law and the practices in this area have been clear for decades. What is it that you're saying here that why do we have a problem now? I mean, it's been very clear for a long time what the rules of engagement are, if you want to use a nautical term, that applies to these kinds of arrangements. What is there about what you're saying that takes this out of the ordinary case? I'm missing something. Well, the direct question of whether a union hiring call fee can be prohibited by a right to work law, to my knowledge, this is the first federal court case to actually consider that very question. It, quite frankly, doesn't come up very much. And so the question There may be a reason for that. Yes, just in terms, I believe most people who use hiring calls generally tend to be union members. You don't see as many non-members, just given the control the union has over the individual's employment. So there's been very few cases. But that being said, that is now the question before this court. And so earlier cases that Your Honor may have been referring to were, is a referral fee lawful under the National Labor Relations Act? For example, Houston Maritime cases to that effect. And so that was decided in the past. Although Houston Maritime didn't directly address the legality of a hiring call fees be refunded as a remedy for other discrimination in that case. But the legality of hiring call fees under the National Labor Relations Act only proves why they can be banned by state right to work laws under 14B. 14B allows states to ban the fees that the NLRA otherwise prohibits, I'm sorry, otherwise permits. So if the National Labor Relations Act permits the charging of this hiring call fee, then states can ban it under 14B. That's the symmetry of the law. And I submit the union's position and the district court's conclusion upsets that symmetry, in which the court says, yes, this fee can be charged under the National Labor Relations Act, but no, it cannot be prohibited under a right to work law. But if you're right that payment of a referral fee is, constitutes membership in a union, which I think is your argument, and you have to have paid a, you have to go through the hiring hall before getting the job, so it would basically be requiring membership before getting a job. Why isn't that akin to essentially a closed shop, which is what the NLRA prohibits, and what the Teamsters decision from the Supreme Court in 1961 distinguished from a referral fee? Well, what the Teamsters decision allowed for a referral through a union hiring hall. And so there's no argument here that a referral in and of itself violates the law. Rather, it's the compulsory union fee. That is the membership. But why doesn't that make it a closed shop, which would be prohibited? Well, it could be. It's equivalent in the same way. So in the same way that a union couldn't require that somebody be a full union member in order to become employed, that would violate Mississippi's right to work law. So, too, would requiring that Mr. Sims pay a fee in order to become employed violates the right to work law. And I think these questions are moving into the question of whether 14b is limited only to post-hire conditions of employment, as the district court concluded as its basis for dismissing this portion of the complaint. And I submit that, first, 14b is not limited to post-hire conditions of employment. Even if it was, the union's fee is a post-hire condition. Now, foremost, 14b refers to conditions of employment. That refers to conditions of the district court in Callahan, which found that Michigan's right to work law, which applied to conditions of obtaining or continuing employment, could apply to conditions of obtaining employment because that phrase, how it's used within 14b. But isn't there also a pure fact question here, that is to say whether the payment is just a payment as a reasonable reimbursement for the pro rata expenses of the hiring hall as opposed to some kind of condition of employment? Well, it's a condition of employment, Your Honor. The union asserts that this fee is for potential or that Sims doesn't challenge whether it's reasonably limited to the cost of reimbursement. But under Mississippi's right to work law, exactly what the fee is used for is irrelevant. So, for example, under Beck, a union can charge employees fees for the pro rata share of contract administration collective bargaining, yet Mississippi and all other right to work states can ban such fees. And so, too, here, irrespective of exactly how the union spends that fee, whether it goes towards the hiring hall or union membership expenses, it doesn't matter. If it's dues or fees within the meaning of membership under 14b, then it is a fee that Mississippi can prohibit. If we decide that this is a preemployment fee, is that the end of the ball game? Does that decide the case in the union's favor? No, Your Honor, because I submit that 14b isn't limited to post-hire conditions of employment because it refers to the phrase conditions of employment, not just conditions of remaining employed. And the district court in Callahan construed Michigan's right to work law that way. In fact, almost all right to work laws, including Mississippi's, recognize that distinction in which they apply to conditions of employment or conditions of remaining employed. But you don't have a case that extends that principle to this specific situation. Is that right? Callahan does. In Callahan, the union challenged Michigan's right to work law. And one of the grounds, it said, well, this right to work law could be forced against hiring hall fees, and that's not permitted under 14b. The district court disagreed and said, as long as the employer's involved in requiring that fee as a condition of employment, that was a lawful exercise of Michigan's authority because the phrase conditions of employment refers not just to conditions of remaining employed but becoming employed. But also here, the fact is the fee is, in fact, a post-condition requirement of employment. The fee is a percentage of wages that is deducted from Mr. Sims' paycheck. Both happen after he is employed. And also, Mr. Sims is not, in fact, a new employee every day. He's worked consistently for CSCA equipment for many years. He goes to work every workday morning, just like everyone else. Now, he has to check with the union hiring hall each day, but he is not, in fact, a new employee each day, either as a practical matter or, for that matter, as a legal matter under Section 883 or 8F. Those provisions require that you can't charge compulsory fees until either 30 days after the beginning of such employment or seven days. Now, that limit isn't in 14B, but even if it was, that time limit, according to the Board, accumulates cumulatively. In other words, if you have a reasonable expectation that you're going back to work, the 30 days continues to count. You don't get a new 30-day period every single time. So for Mr. Sims, once he was employed by CSCA for 30 days, he satisfied Section 883's requirement. I mean, I understand your textual argument about conditions of employment would include pre-employment requirements, but how do you get around mobile oil, which does seem to make this Section 14B's application turn on this pre-versus post-employment distinction? Yes, mobile oil addressed only the jurisdictional question of where does a right to work law apply. So in that case, the question was, did Texas's right to work law apply to seamen who spent almost all their time working on the high seas but were generally hired out of some ports in Texas? And the Court said in determining where a State's right to work law applies, we'll look at the job situs as opposed to where the individual is hired, because that's the most important thing. But in that case, the Court wasn't deciding if a fee required as a condition of obtaining employment was lawful or not. It was simply considering where the jurisdictional basis for the law was most strongly supported. And again, the Court showed job situs. Here, of course, Mr. Sims is both hired and works in Pascagoula, Mississippi. So mobile oil is no impediment to his cause of action in this case. And with that, I have two minutes, so I don't want to start an entire other line of argument. So unless there's any questions from the Court, I'll save my time for it. All right. Yes, thank you, Mr. Messick. Thank you. Roberts. May it please the Court. Since the enactment of the Taft-Hartley Act, there's been a thorough consideration of the difference of hiring hall agreements and hiring hall fees and union security agreements and union security fees. And it's quite clear in the Board jurisprudence and in the jurisprudence of this Court and the other courts of appeals that have addressed it and in the Supreme Court that the two are totally different animals. The statutory scheme is that 8A3 and 8B2 prohibit discrimination that encourages union membership. Then the first proviso to 8A3 provides a limited defense where there's an agreement, an actual agreement between the employer and the union requiring union membership on or after the 30th day of employment or after the effective date of that agreement. The 14B allows states to outlaw those agreements that are allowed as a defense to the anti-discrimination rule. From the very beginning, hiring halls and union security agreements have been distinguished. First of all, they've been distinguished for their purpose. As the Supreme Court has pointed out over and over again, quoting Senator Taft, hiring halls are in the nature of an employment agency and viewed as a benefit for the employer as well as the employees. Secondly, for the union, for there to be a hiring hall arrangement or for the union to impose a fee, there's no necessity for an agreement as there is with union security agreements. And that was litigated early on in the cases we cited. And third, and this is the reason it was litigated, is that the fees charged are calculated in a totally different way. Under a union security agreement, everybody in the bargain unit can be charged full dues and full initiation fees as a condition of employment. That is not so in a hiring hall situation. The hiring hall fee has to be limited to the cost of the benefit. And there were early cases where the union tried to claim that it was allowed to charge full dues because everything it benefited the people, and the courts and the board rejected that and said, no, if you want to do that, you do it through a union security clause. That's why Congress authorized that. So it's just completely untrue that this issue hasn't been exhausted. It was exhausted in the first 15 years under the Taft-Hartley Act, and it's been settled ever since then. Every single hiring hall case was wrongly decided on Mr. Sims' view, because in every one of those cases, the union has been required to show a relation between the cost it incurred and the benefit, I mean, and the fee charged. That's not so under a union security clause, where the calculation is what are normal dues. But what about his argument that Beck expanded this definition of membership to include just the financial component, and that those cases from the 60s don't — aren't consistent with Beck? Beck did no such thing. In fact, Beck reinforces the distinction between the two, because Beck recognizes that union security agreements are for the purpose of funding the union as an institution to carry out the collective bargaining function. Beck overlays the duty of fair representation on the basic charge. I mean, as to members of the union, as to people who don't object, people are required to pay full dues as a union. Beck has cited multiple cases under the Railway Labor Act, which has the identical rule, Shay versus Machinists, just recently CERNA versus transportation workers, which stand for the proposition that as to the run of bargaining unit members who don't object, the charge is full dues. All Beck says, and it's very clear if you go back to the street, it's an overlay on the basic obligation meant to protect dissenters. It has — it's an implied duty the union has to that particular subset of the bargaining unit, but it doesn't change the basic definitions or what would constitute a union security agreement. Here, the employer has nothing to do with the fee. The employer has not agreed to the fee, even by the allegations and the complaint. The employer has only agreed to a hiring hall agreement, and, of course, the hiring hall procedures will be the hiring hall procedures, but the employer has not agreed to a fee. And if this were in a non-right-to-work state and the union tried to justify a charge that went all the way up to dues, this would be totally inadequate. The union tried that in the Second Circuit case we cited, local 138 operating engineers, and that opinion thoroughly explores the difference between union security agreements and hiring hall agreements and says, no, that is not adequate to invoke that defense. Because you have to keep in mind, this begins with a defense. It's not — it's not a negative, like an invitation to bring the states in and police this. It's a defense that the union and the employer claim to justify discrimination, and they have to establish an agreement, and they have to meet certain preconditions. This is nothing like that. The Callahan decision is, of course, only a district court opinion, and it's in a faraway jurisdiction. Nonetheless, let me just ask you, is the reasoning of Callahan flawed in your view? Well, you know, my memory of — You didn't mention it in your brief, so I don't know what you — Yeah. My memory of Callahan is that it's sort of in the middle, that he's saying, I don't see this as barring the fees, but maybe it bars the condition to getting in. I don't see it as being categorical, and I don't see it exploring all of these issues that we're exploring here. I mean, we fully briefed the distinction between union security clause and hiring hall fees, and I don't think Callahan does anything to call that into question. And this Court has precedent. This Court has, early on, was among the first courts to address the issue. This Court held that hiring hall agreements are not within 14b so long as they're nondiscriminatory. This Court held that hiring hall fees do not constitute discrimination so long as they're based on cost. Which cases are you referring to? Let me say to them in our brief. I'm sorry that memory is so poor. It's all right. Take your time. Just look them up. Houston Maritime is the fee case that holds that reasonable fees based on cost are nondiscriminatory, and then Houston Chapter Associated General Contractors is the case that holds that nondiscriminatory hiring hall agreements are not within 14b because they do not require union membership in the sense that the proviso in 14b contemplate. What difference does it make, if any, in your view, that the fee here is a percentage of wages? I don't think that it makes any difference. If Mr. Sims had challenged the amount of the fee as he could have, he could have brought a claim like that, then he could have argued that this fee doesn't correspond to cost. But it doesn't categorically change the nature of it. There are cases that we cited where the fee is relative to dues and the Board will look at the costs and see if it works out to be a reasonable allocation of costs. But the fact that it's a portion of dues doesn't really say anything. It would if this were a union security case because then that would be the test. But being it's a hiring hall case, we would have to justify the fee based on cost of the hiring hall. For someone who is a member of the Longshoremen Union, do they pay the referral fee as a percentage of their paycheck and then a separate union dues, or are the hiring hall costs subsumed in their dues? They're subsumed in the dues. I mean, unions do it different ways. This union, as I understand it, does it by charging the members' dues, which are higher than the hiring hall fee, and then it's assumed that their dues will include. But, you know, the unions do it all sorts of different ways. They charge flat fees up front. They charge, you know, different calculations. Sometimes they charge members and non-members. It's just a totally different issue than the dues issue. And one other question about the practicalities of this, and this might go to the whole distinction of whether this is pre- or post-hiring. How does it work each day, even for someone like Mr. Sims, who's been a long-time employee? What happens to them each morning? Are they actually given an assignment each day, and that's how the seniority is charted, or just how does it work? Yeah, they get assignments each day. I mean, the way in the maritime industry, the reason these things are a benefit to the employer is that ships come in and they need to put together crews. So the union has access to people who know how to do those jobs, and the employer can say to the union, we need X number of longshoremen, X number of clerks. Assemble them, and the union will assemble them, and then the jobs will be parceled out. The employer's benefit is it gives the union to put the crews, I mean, make people available. The worker's benefit is that someone that is their representative is doing the parceling, so they don't have to worry about favoritism and that sort of thing. So that's why it's a benefit to both sides. And this is now a very small operation at this local, but it didn't used to be that way. There used to be, like, eight or nine stevedoring companies coming through this hiring hall, and so these companies would be assembling crews out of a much wider workforce. Now this gets down to a very small, a very small number of people, but the general idea is that this is an employment agency, and that was what Congress envisioned it to be, and that was why the fee was justified and why it was allowed. Nothing like a union security agreement. All right, thank you. Well, thank you very much. Mr. Messenger, you save time for a vote. Thank you, Your Honor. The union's position, there's a distinction between fees that would be collected under a union security provision, which are sort of institutional union expenses versus special fees for other purposes, fails because it's contrary to the board's decision in Kingston Constructors. And I believe that case is actually worth discussing because of its importance here. In Kingston Constructors, the union charged employees a special fee of 3.5 percent that went to a union market recovery program, and what that program did was it subsidized, unionized employers so they could win bidding contracts. And the employees in that case argued, you can't compel us to pay that fee because it's outside of the proviso. This fee doesn't go to union expenses. It goes to the special program. The board rejected that position, and the board clarified that since its 1971 decision in Detroit Mailers, any fee that is periodic, uniformly imposed, and not devoted to a purpose inimical to public policy can be charged to employees under the proviso. And that includes the special fee to the extent it wasn't used for purposes that were inimical to public policy, which in some instances it was because of conflict with prevailing wage laws. But the thrust of Kingston Constructors was that the membership, as defined under the proviso, and that's under 14b, is all fees that are periodic, uniform, and not inimical to public policy. Any distinction that may have existed between fees for special union purposes versus fees for institutional purposes was erased in Kingston Constructors, and arguably it hasn't existed since 1971, which was the case that case referred back to. I saw Your Honors looking at the briefs. Kingston Constructors in the table of contents is International Brotherhood of Electrical Workers, parentheses, Kingston Constructors. Just in referring to LRA cases, it's usually the name of the employer that's used, but it's cited in appellant's brief. But I think that's key here because that eliminates the distinction claimed by the union. And also the Supreme Court's decision in Beck. Again, Beck construed Section 8A.3 to allow — generally you can charge the fees mentioned before, the uniformly imposed ones, but if an employee objects under Beck, an employee can only be forced under proviso to pay fees for collective bargaining, contract administration, and grievance adjustment. Here, as stated in the briefs, the union's operation of a hiring hall, it's contract administration. It's nothing more than that. It is administering a term of the hiring hall. And because it is a fee for contract administration, it's a fee that could be charged under the proviso, according to Beck, and thus banned by States under Section 14B. But why can't it be analogized to an employment agency that also benefits the employer? It can be analogized to an employment agency, and arguably it could benefit the employer in some circumstances, but in terms of the statutory analysis, it doesn't change. So, for example, many compulsory union services are — can be considered fees that are chargeable under the proviso, according to Beck, but yet banned under 14B. A good example, and this is one in the brief, is grievance adjustment. Most unions negotiate clauses that say if you want to adjust a grievance with your employer, you have to go through the union. You can't do it independently. That's legal. However, States can ban fees for grievance adjustment. So in a right-to-work State, such as Mississippi, they couldn't force an employee to use the union's grievance fee machinery — a grievance machinery to process their grievance. A hiring hall is conceptually no different. It is just a mandatory union service required by a collective bargaining agreement. And under Mississippi law, no dues, fees, or other charges can be charged to employees. And as long as that fee constitutes the word membership, within the meaning of 14B, that application of Mississippi's right-to-work law is not preempted. And again, membership under 14B includes any dues that are uniformly imposed, periodic, and non-anonymical to public policy. And there's been no argument that the union's fee doesn't satisfy that requirement. And then just finally, I want to note the two cases cited by the Union's counsel. Houston Chapter regarded only whether a union hiring hall could be prohibited by a right-to-work law, not a union hiring hall fee. And in fact, the reason this Court held the hiring hall wasn't within the meaning of 14B is because membership, meaning dues or fees, were not required for a referral. And the Seventh Circuit in Sweeney recognized that distinction in footnote 8 of its decision, where it said under Houston Merit or Houston Chapter and also another decision called CUNCO, all that was required in that case was that employees temporarily visit the hiring hall. Membership was not required. Here, membership is required in the form of compulsory fees, and that is what 14B allows Mississippi to prohibit. With that, Your Honor, thank you. Thank you, Mr. Messenger. Your case is under submission. Thank you, Your Honor.